# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | |
| | § | CRIMINAL ACTION H-06-441 |
| GABRIEL YANEZ, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION & ORDER

### I. INTRODUCTION

The Government has charged defendant Gabriel Yanez with the unlawful possession of a short-barreled firearm in violation of 26 U.S.C. §§ 5841, 5861(d), & 5871. Houston Police Department ("HPD") officers seized the sawed-off shotgun during a warrantless search of the defendant's home on October 24, 2006. Pending before the court is defendant's motion to suppress the shotgun obtained during the search and any statements obtained in violation of *Miranda* and its progeny or the fruit of the poisonous tree doctrine. After considering the arguments of counsel, the testimony of record, and the applicable law, the court finds that the defendant's motion should be DENIED in its entirety, except that the court defers a decision on the admissibility of the defendant's second confession until further probative evidence is heard at trial outside the presence of the jury.

### II. FACTUAL AND PROCEDURAL BACKGROUND

On Tuesday, October 24, 2006, at approximately 5:50 p.m., HPD Lt. Stephen Casko and Officer Eric Blankenship were conducting an auto theft investigation in a southeast Houston neighborhood at the corner of Monroe and Almeda Genoa. Dkt. 30 at 7. At some point in the course of their investigation, they suddenly heard at least 30 gunshots coming from an area southwest of

their location.  *Id.* at 8.  The officers left the area in unmarked cars, driving around the neighborhood

and searching for the source of the gunfire.  *Id.*  As Blankenship proceeded to the scene, Casko was

flagged down by a witness who was waving frantically and pointing to a nearby residence at 8403

Gullick Lane.  *Id.* at 9.  Casko asked the witness if that house was where the shots were coming

from, and she confirmed that fact.  *Id.*  Casko then left his vehicle and ran to the residence where

another witness, defendant's sister Lizet Yanez ("Lizet"), was standing in the doorway.  *Id.* at 10.

According to Lt. Casko, Ms. Yanez was absolutely terrified and "[s]he was shaking" out of fright.

*See id.*  He inquired about what was going on, and Lizet responded that "somebody was shooting

upstairs."  *Id.*  Notably, Lizet did not identify the shooter or shooters who had threatened the

community's safety.  However, Casko did ask her who else was in the house, and she stated her sister

was also present.  *Id.*  He queried where the sister was, and Lizet stated that she was upstairs.  *Id.*

He went upstairs and retrieved the other sister, Crystal Yanez ("Crystal"), who was coming out of

her room at the top of the staircase.  *Id.*  Crystal was also extremely frightened, and she too said that

"somebody was shooting in the house" and indicated that the gunfire was emanating from a room

down the hall.  *Id.* at 11-12, 37.  He took both girls outside to safety, and he was met by Officer

Blankenship shortly thereafter.  *Id.* at 11.  At the time, Lizet was twelve years old, and Crystal was

nineteen.  *Id.*

Once the girls were safely outside, the officers entered the home again and ran up the stairs.

*Id.* at 12.  As they advanced down the hallway to the location from which witnesses said gunshots

were coming, they noticed a closed door which suddenly opened.  *Id.*  One of the two suspects, a 15

year-old juvenile named Ramiro Emilio Sanchez, emerged from the doorway with the defendant

close behind him.  *Id.*  Casko walked up to the doorway, ordered the suspects to raise their hands,

2

and handcuffed both of them, obviously doing so without an arrest warrant. *Id.* at 13-14. At this point, Sanchez was in the doorway and defendant Yanez was standing inside the room next to the bed. *Id.* at 14-16. Yanez could have easily reached the bed from the position in which he was standing. *Id.*

Lt. Casko searched Sanchez's person, and Blankenship searched Yanez. *Id.* at 42. Casko then asked the arrestees "where is the gun?" *Id.* at 14. The defendant did not respond, but Sanchez stated that he didn't have it. *Id.* Casko noticed a loaded clip for a pistol lying on the bed, and he asked the suspects where the absent pistol was. *Id.* Sanchez nodded toward the bed and said, "It's under there." *Id.* at 15. Believing that Sanchez indicated that the gun was under the mattress, Casko lifted up the edge of the mattress and saw a sawed-off shotgun with a pistol grip lying on the box spring at the foot of the bed near Casko's leg, in close proximity to where Yanez was standing.[1] *Id.* That sawed-off shotgun, however, did not match the loaded clip, and Casko again asked Sanchez where the matching pistol was located. *Id.* at 19. Sanchez replied that it was wrapped in a blanket—when Casko unfurled the blanket, he found the clip's mate, a Beretta .40 caliber pistol. *Id.* At the time, Casko was standing adjacent to the mattress, and Yanez was to his immediate right. *Id.* at 16. Yanez was standing 4 to 5 feet away from the bed. *Id.* Lt. Casko testified that the shotgun at the foot of the bed was within the defendant's reach. *Id.* at 18.

---

[1] This fact, the lifting of the mattress and the discovery of the shotgun contemporaneous with the arrest, was disputed at the suppression hearing. Ramiro Sanchez testified that the Casko's recollection of events was incorrect, and neither Casko nor Blankenship lifted the mattress and discovered the shotgun immediately after the suspects were handcuffed. Dkt. 30 at 61. Nevertheless, the court finds that due to his admitted biases in favor of the defendant, *see id.* at 65, Sanchez's testimony is less than credible, and the court instead credits Casko's version of events in this matter.

3

After Casko secured the pistol and made sure that it was unloaded, the officers brought both of the suspects out of the house.  *Id.* at 20.  Both the shotgun and the pistol were left in the bedroom. The officers separated the suspects on both sides of Blankenship's van and waited for Officer Drey's patrol car to show up and transport the arrestees to the police station.  *Id.*  As they were waiting, Yanez repeatedly volunteered that the weapons were his alone, that he purchased them, and that Sanchez should not be blamed for owning any of the discovered weapons.[2]  *Id.* at 21.

Then, less than five minutes after the officers exited the home, the marked patrol car arrived to pick up the two suspects.  *Id.* at 22.  The officers secured them in the back of the vehicle and entered the home a third time.  *Id.*  Lt. Casko testified that he believed there were still weapons in the upstairs bedroom which had not been secured, and he did not know whether there was anyone else remaining in the home.  *Id.* at 53.  Casko was concerned that other persons could have still been in the home, either accomplices of the suspects or persons who could have been injured during the gunfire.  *See id.* at 53-54.  Casko obtained the older sister's written consent to search the premises, and he seized the sawed-off shotgun from the upstairs bedroom.  *Id.* at 24-25.   Additionally, he recovered the Beretta .40 caliber pistol and a Colt AR-15 rifle that was in the closet.  *Id.* at 25. Based on the shots they heard earlier, the officers reasonably assumed that the rifle was the weapon that had recently been fired by the suspects.  *Id.* at 54.

---

[2] Although Sanchez testified that Yanez made these statements in response to police questioning, *see id.* at 62,  the court finds that Yanez's statements were indeed volunteered and not the product of any custodial interrogation.  Yanez did not testify at the suppression hearing and the court discredits Sanchez's testimony for the reasons stated above.

After Casko and Blankenship searched the premises for several minutes, Casko returned to the patrol car to speak with the defendant.  *Id.* at 22.  He Mirandized the defendant,[3] and the latter waived his rights.  *Id.* at 22-23.  Yanez repeated the same statements as before, specifically that the guns were all his and that he did not want Sanchez to be implicated for any crimes surrounding the gun ownership.  *Id.*  at 23.  He explained numerous times that the guns were not stolen and that he legitimately owned the guns.  *Id.* at 23-24.  He also told Casko that he had cut the barrel off the shotgun himself, and that he had purchased the shotgun at a pawnshop.  *Id.* at 24.  Based on the defendant's inculpatory admissions, the officers released Sanchez and transported Yanez to the police station.

Six weeks later, on December 7, 2006, a federal grand jury indicted Yanez for the knowing possession and receipt of a short-barreled firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871.  *See* Dkt. 1.  Defendant was arrested by federal authorities and appeared before Magistrate Judge Frances H. Stacy on December 13, 2006.  Dkt. 14 at 1.  The magistrate judge ordered the defendant released on a $30,000 unsecured bond.  *Id.*  As the case proceeded toward trial, defendant filed the instant motion to suppress, and the court held an oral hearing on April 30, 2007.  *See* Dkt. 30.  After the hearing, the defendant filed a supplemental memorandum of law in support of his motion to suppress.  *See* Dkt. 31.  The Government filed two additional responses, Dkts. 32 & 34, and the defendant replied to the Government's second response to the motion.  Dkt. 33.  The court has carefully considered the parties' extensive briefing on the entire panoply of constitutional issues, and the defendant's motion to suppress is ripe for decision.

---

[3] At the suppression hearing, Lt. Casko testified that he advised Yanez of three of the four *Miranda* rights, but he did not address whether he advised Yanez that he had a right to appointed counsel if he could not afford to retain counsel for questioning.  *See* Dkt. 30 at 22-23.

### III. ANALYSIS

The defendant alleges that the sawed-off shotgun and related testimonial statements were obtained in violation of the Fourth and Fifth Amendments to the United States Constitution, respectively. He also argues that even if the court finds that the officers complied with the dictates of *Miranda* in their interrogation, the testimonial statements about the firearm should be suppressed as fruit of the poisonous tree discovered after the unconstitutional search for the weapon. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (holding that secondary physical evidence obtained as the direct result of a Fourth Amendment violation must be suppressed); *United States v. Moore*, 329 F.3d 399, 404 (5th Cir. 2003) ("Evidence obtained as a result of the exploitation of an illegal search or seizure should be suppressed."). Although each of these doctrines are interrelated, the court will analyze each of them separately for purposes of clarity, in the order listed above.

### A. THE FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution provides in full:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. As the Supreme Court has succinctly stated: "[The Fourth Amendment] was a reaction to the evils of the use of the general warrant in England and the writs of assistance in the Colonies, and was intended to protect against invasions of the sanctity of a man's home and the privacies of life from searches under indiscriminate, general authority." *Warden v. Hayden*, 387 U.S. 294, 301, 87 S. Ct. 1642 (1967).

In order to protect these interests and properly limit sovereign action in the area of search and seizure, the Supreme Court has adopted an "exclusionary rule" that requires the suppression of evidence obtained in violation of the Fourth Amendment.  *See Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341 (1914). In 1961, the Court extended this rule's application to restrain state and local actors, finding that the protections of the Fourth Amendment were incorporated through the Due Process Clause of the Fourteenth Amendment.  *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684 (1961) ("We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court.").  Here, the defendant argues that numerous police actions up to and resulting in the seizure of evidence in his home violated the Fourth Amendment and demand exclusion.  These individual challenges are addressed below.

## 1.  The First Warrantless Entry into the Home

The defendant contends that the arresting officers violated his Fourth Amendment rights through the entry into his home without a warrant.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *See Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371 (1980) (*quoting Coolidge v. New Hampshire*, 403 U.S. 443, 477, 91 S. Ct. 2022 (1971) (opinion of the Court)); *United States v. Maldonado*, 472 F.3d 388, 392 (5th Cir. 2006).  Indeed, according to the late Judge Leventhal, "Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment."  *Dorman v. United States*, 435 F.2d 385, 389 (D.C. Cir. 1970) (Leventhal, J.).

Nevertheless, despite this broad language, the Court has permitted warrantless searches and seizures in a private dwelling if exigent circumstances justify the intrusion.  *See Warden v. Hayden*,

7

387 U.S. 294, 298-99, 87 S. Ct. 1642 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.").   The Government has the burden of proving the existence of exigent circumstances, *see Maldonado*, 472 F.3d at 393, and under applicable precedent, the determination of what constitutes "exigent circumstances" is essentially a factual inquiry. *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997).   Such circumstances are present, and a warrantless intrusion may be justified "by hot pursuit of a fleeing felon . . . or the need to prevent a suspect's escape." *See Minnesota v. Olson*, 495 U.S. 91, 100, 110 S. Ct. 1684 (1990) (internal quotation marks omitted) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 104 S. Ct. 2091 (1984).   "Exigent circumstances [also] exist when there is a risk that the officers or innocent bystanders will be endangered, or that evidence will be destroyed." *Blount*, 123 F.3d at 837.   In evaluating the exigency of the situation, the court should consider "the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." *United States v. Rodea*, 102 F.3d 1401, 1405 (5th Cir. 1996) (internal quotations and citation omitted).   "If 'reasonable minds may differ' the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation." *Blount*, 123 F.3d at 838 (*quoting United States v. Howard*, 106 F.3d 70, 76 (5th Cir. 1997)).

Here, before the officers entered defendant's home, they faced a fluid, fast-moving situation in which the safety of the public was at risk as an unknown gunman fired a weapon from an upstairs bedroom.   Such a situation presents the paradigmatic instance of exigent circumstances, in which the officers reasonably acted with haste to enter the premises and stop a shooting spree they reasonably believed was endangering neighborhood citizens.   Accordingly, while warrantless entries

into a home are presumptively unreasonable, *see Payton*, 445 U.S. at 586, the court finds that the Government's claim of exigent circumstances rebuts the presumption and renders the initial entry a reasonable one. After the officers entered the home, they found the defendant's two sisters, removed them from harm's way, and escorted them outside. This action was clearly motivated by the need to protect those inside who could have been shot by the as-yet unidentified shooter or shooters. This entry into defendant's home does not run afoul of the Fourth Amendment.

## 2. The Second Warrantless Entry into the Home

After the officers brought the defendant's sisters to apparent safety, they returned inside the home to find and arrest those who were posing a serious risk to the officers and public safety. Once inside the defendant's bedroom, the officers arrested the suspects and discovered the shotgun underneath the mattress. The defendant objects to the search for the weapon on two grounds: (1) that the seizure was not justified by exigent circumstances; and (2) that the seizure could not have been made incident to a *lawful* arrest because the police possessed no probable cause to arrest the defendant for discharging a firearm in a metropolitan area, a misdemeanor under Texas law. The court will address these contentions in turn.

### a. Exigent circumstances

First, the Government defends the firearm search as necessary under exigent circumstances. The Supreme Court has held that once officials make a warrantless entry into a home based on reasons of exigency, they may lawfully search for the suspect and those areas where weapons might be hidden. *See Hayden*, 387 U.S. at 299 ("Speed [is] essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape."). In

9

*Hayden*, several police officers entered a home to which they received a report that an armed-robbery suspect had fled.  *Id.* at 297-98.   The officers split up and contemporaneously searched for the suspect and any weapons which might threaten them or the public.  *Id.*  The officers discovered two guns, other physical evidence, and the suspect hiding on the second floor.  *Id.* at 298. The *Hayden* Court held that the warrantless searches and seizures were lawful under the circumstances presented. The court expressly sanctioned the scope of a search to be "as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape."  *Id.*  at 299.   This includes the search for the individual and any items the suspect may use against the officers.  *Id.*

In a case similar to *Hayden*, the Fifth Circuit has found exigent circumstances justifying a search "in the face of a serious and demonstrable potentiality for danger to the arresting officers." *See United States v. Quigley*, 631 F.2d 415, 419 (5th Cir. 1980).  In *Quigley*, the police entered a hotel room, handcuffed the defendant, and placed him against a wall, far outside the reach of a weapon underneath the mattress of the bed.  *Id.* at 417.  A possible accomplice of the defendant, a female companion, was sitting in a chair five feet from another bed in the room.  *Id.*  One of the officers asked her if there was a gun in the room, and she responded in the affirmative and pointed toward the bed.  *Id.*  The officers lifted the mattress and found the pistol that was the basis of subsequent charges against the defendant.  *Id.*  In holding that the search was a proper, limited precautionary search, the court reasoned:

> In the light of hindsight, we know that the pistol underneath the mattress was beyond both her reach and that of the handcuffed arrestee [the defendant]; however, at the time of the arrest and of the query, for all the officers knew the weapon was within the reach of the girl or, even, of Quigley.  The circumstance that the search took place within seconds of the arrest is further support for the conclusion that the attempt to locate the firearm was a reasonable and cursory check to protect the safety of the officers.

*Id.* at 419.  In a related case, *New York v. Quarles*, 467 U.S. 649, 653, 104 S. Ct. 2626 (1984), the Supreme Court upheld pre-*Miranda* questioning and the warrantless search for a weapon in a supermarket when the police believed the suspect hid the weapon, thereby posing a real and immediate threat to public safety.  The Court stated, "[s]o long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: *an accomplice might make use of it*, a customer or employee might later come upon it."  *Id.* at 657 (emphasis added).  Admittedly, *Quarles* is not precisely on point, as its holding simply created a public safety exception to the requirement of administering *Miranda* warnings before custodial interrogation.  *Id.* at 653 ("[W]e believe that this case presents a situation where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*.").  However, its discussion about the need for officers to act quickly to protect the public safety is instructive.  The officers often must act in certain fast-moving situations to discover a possibly hidden weapon for the their protection and that of the public. *Quigley* upheld such precautionary searches, as long as there was a "'serious and demonstrable potentiality for danger.'"  *See Quigley*, 631 F.2d at 419 (*citing United States v. Smith*, 515 F.2d 1028, 1031 (5th Cir. 1975)).  The *Quarles* Court came to a similar conclusion, finding that the discovery of the firearm in a public place was imperative to protect officer and public safety.  *Id.* at 657-60.

In the present case, the court finds that exigent circumstances warranted a search of the entire space in which the weapon(s) used to threaten the public might be found.  *See Hayden*, 387 U.S. at 299.  The suspects were discovered in a small room, and it would be reasonable to believe that the gun used in the illegal act was still inside that space, warranting a search for that weapon and any ammunition.  *See also Quigley*, 631 F.2d at 419 (upholding a search under a mattress for a weapon, even when the suspects present are in handcuffs, when "the attempt to locate the firearm was a

11

reasonable and cursory check to protect the safety of the officers"). The officers needed to proceed with the warrantless search in order to ensure their own safety from the arrestees. *See id.* Furthermore, in the time the officers would need to obtain a search warrant, another accomplice hidden in the home could find the weapons and begin shooting again, triggering a renewed threat to public safety. *Cf. United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995) ("Exigent circumstances include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence." (internal quotation marks omitted)). In sum, the officers' search for the weapon in this case was borne of exigent circumstances to protect their safety and that of the public; thus, the warrantless search which resulted in the discovery of the shotgun was reasonable under the Fourth Amendment.

**b. Search Incident to a Lawful Arrest**

In the alternative, the court finds that the search under the mattress contemporaneous with the suspect's arrest was a valid *Chimel* search, i.e., a search incident to a lawful arrest of the area within the defendant's "immediate control." *See Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034 (1969). The defendant disputes the fact that the *Chimel* rationale is applicable for several reasons. First, the defendant argues that there was no "valid predicate arrest" to support the search because the officers lacked probable cause at the time he and Sanchez were discovered upstairs. Second, the defendant contends that when the officers handcuffed him and Sanchez, they had only effected a *Terry*-type temporary detention that could not support a search incident to a lawful arrest.[4]

---

[4] *See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). The *Terry* Court allowed law enforcement to seize an individual for limited purposes based on a new level of justification, reasonable suspicion, which falls somewhere below probable cause. Defendant seeks to characterize the handcuffing in this instance as an investigative *Terry* stop for obvious reasons: officers may not engage in a search incident to a lawful arrest when the seizure of the individual

Lastly, the defendant argues that the area under the mattress was not within his grabable space, as he was already in handcuffs, and thus the search was not reasonably necessary for officer safety and violated the Fourth Amendment.

### 1. *Probable Cause for the Arrest*

If exigent circumstances demand a warrantless entry, as they did here, the officer may effect an arrest of a suspect if there is probable cause to believe that he is guilty of a crime. *See Olson*, 495 U.S. at 100; *United States v. Hicks*, 389 F.3d 514, 526-27 (5th Cir. 2004) (citing *United States v. Vasquez*, 953 F.2d 176, 179 (5th Cir. 1992)). This crime can even be a misdemeanor, as long as the officer possesses the requisite probable cause and the offense is committed in the officer's presence. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536 (2001). "Probable cause for a warrantless arrest exists when the totality of the circumstances within a police officer's knowledge at the moment of the arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *See United States v. Garcia*, 179 F.3d 265, 268 (5th Cir. 1999). In evaluating the "totality of the circumstances," the court must determine whether the officials had enough information to believe that there was a fair probability that a crime occurred. *Id.* at 269. A "fair probability is something more than a bare suspicion, but [it] need not reach the fifty percent mark." *Id.*

Defendant states that the officers could not reasonably believe that there was a fair probability that he, rather than Mr. Sanchez, was the person firing the weapon on the premises. The court disagrees. By the defendant's own admission, he does not contest that the officers had probable

---

is not an arrest at all, as probable cause is lacking. *See Macias v. Raul A. (Unknown), Badge No. 153*, 23 F.3d 94, 100 (5th Cir. 1994). Such searches are invalid, and the evidence seized therein should be excluded from the trial.

cause to believe *someone* was guilty of the misdemeanor of recklessly firing a weapon in the Houston city limits. *See* TEX. PENAL CODE ANN. § 42.12 (Vernon 2003) (prohibiting the reckless discharge of a firearm "inside the corporate limits of a municipality having a population of 100,000 or more").[5] Also, the offense was unquestionably committed in the officers' presence, as they heard the shots fired from the defendants' general location before entering the defendant's home, allowing a warrantless arrest to be made. *See Lago Vista*, 532 U.S. at 354; *Winkler v. United States*, 297 F. 202, 203 (9th Cir. 1924) (affirming that when an officer makes a warrantless arrest "for a misdemeanor committed in his presence . . ., the officer must have personal knowledge acquired at the time through his *hearing*, sight, or other sense of the present commission of the crime by the accused") (emphasis added) (internal quotation marks omitted); *United States v. Willis*, 432 F. Supp. 121, 122 (S.D. Miss.), *aff'd*, 564 F.2d 415 (5th Cir. 1977) (table decision). The sole issue is whether the officers had probable cause to believe that Yanez himself was guilty of a crime.

---

[5] Defendant argues that this offense is "relatively minor" and cites *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S. Ct. 2091 (1984), for the proposition that the "gravity of the offense" is a necessary component of the constitutional analysis. *Id.* at 751-52. In *Welsh*, the Court found an absence of exigent circumstances for entry into a home to arrest a person for a DUI offense. *See id.* at 754. While the Court held that an extremely minor offense was unlikely to support a need for a warrantless intrusion into a home, the Court also clearly stated that there could be no constitutionally-recognized exigency when "the only potential emergency claimed by the State was the need to ascertain the petitioner's blood-alcohol level." *Id.* at 753. In a later case, the Supreme Court clarified this point, and found that officers would face exigent circumstances whenever they are "confronted with *ongoing* violence occurring *within* the home," even if the offense itself is not classified as a serious felony. *See Brigham City, Utah v. Stewart*, 126 S. Ct. 1943, 1949 (2006) (finding that officers who overhear violent conduct inside the house had an objectively reasonable basis to enter and stop the violence from escalating and adding that "*Welsh* did not address this situation"). Similar to the ongoing violence present in *Stewart*, the officers in this case had an objectively reasonable basis to enter the home to arrest the suspects and protect the safety of the home's residents and the surrounding community. Even though the gunshots ceased before the officers entered the home, they reasonably could have believed that the gunfire could recur at any time before all suspects were accounted for and removed from the home, along with weapons at their disposal to threaten public safety.

In *Maryland v. Pringle*, 540 U.S. 366, 371-74, 124 S. Ct. 795 (2003) (unanimous opinion), the Supreme Court found in similar circumstances that the police had probable cause to arrest an individual when none of his associates admitted possession of nearby narcotics. In *Pringle*, the defendant was one of three men in a Nissan Maxima that was stopped for speeding. *Id.* at 367. After searching the vehicle, the patrolman discovered five glassine baggies of cocaine under the backseat armrest. *Id.* at 368. All three men denied ownership of the narcotics, and the officer arrested each of them. *Id.* In finding that the officer had probable cause to arrest Pringle, the Court found that the evidence provided a reasonable inference "that *any or* all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." *Id.* at 372 (emphasis added). The Court explicitly stated that this was not a guilt-by-association case, but instead found it reasonable to infer that the men, in close quarters with a large amount of cocaine, were involved in a common enterprise of distributing narcotics. *Id.* at 373 (distinguishing *Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338 (1979), and *United States v. Di Re*, 332 U.S. 581, 68 S. Ct. 222 (1948)). Thus, there existed a fair probability that each of the individuals was guilty of a crime, even though there was no conclusive evidence pointing to any one person in particular. *Id.* at 372 ("[A] reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly.").

The case at bar presents very similar circumstances to those in *Pringle*. Here, the officers approached a small bedroom from which they reasonably believed the shots were fired. They found two persons who cautiously emerged into the hallway, understandably raising the officers' suspicion. At the time, the officers had no way to know whether one or both of the suspects had been firing the weapon. They only knew that a firearm had been discharged several times, but not by whom. As

the officers came upon the room, it was thus reasonable for them to believe that either or both of the suspects had fired the weapon or had engaged in a joint venture to violate the law.  Accordingly, the officers had probable cause to believe that this defendant, Gabriel Yanez, was guilty of an offense, and his arrest did not contravene the protections of the Fourth Amendment.[6]

### 2. The Defendant's Reach

The defendant also argues that the search under the mattress cannot be justified by *Chimel* because that area was outside the defendant's immediate reach.  The Government contends that the defendant, albeit in handcuffs at the time, could have easily accessed the area at the foot of the mattress with a quick lunge, and thus the search which discovered the weapon is constitutional under the Fourth Amendment.  The court agrees with the Government.

When a police officer makes a warrantless arrest, he or she may search the arrestee's person and "the area 'within his immediate control'–construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."  *Chimel*, 395 U.S. at 763. The twin rationales of *Chimel* make clear that this doctrine is an exception to the warrant requirement borne of necessity–for the preservation of probative evidence and officer safety.  *See Thornton v. United States*, 541 U.S. 615, 625, 124 S. Ct. 2127 (2004) (Scalia, J., concurring in judgment).  Given the profound stress attendant to an arrest, to both the suspect and the officer, this limited exception makes eminent sense and adequately balances the concerns of public safety and

_____

[6] Because the court holds that the officers had probable cause to arrest the defendant,  it need not address at length defendant's argument that the handcuffing of the defendant was a *Terry* -style temporary detention.  The defendant's seizure bore the hallmarks of an actual arrest as viewed by a reasonable person, including the limitation of his liberty through handcuffs, and his seizure was predicated upon evidence creating more than a reasonable suspicion of wrongdoing.  Thus, this seizure resulted in defendant's custody and actual arrest.  *See United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006).

the protections inherent in the Fourth Amendment. *See Washington v. Chrisman*, 455 U.S. 1, 7, 102 S. Ct. 812 (1982).

In the case of a handcuffed suspect, the restraints obviously limit "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Chimel*, 395 U.S. at 763. For background purposes, the court repeats the Fifth Circuit's cogent explanation of the efficacy of handcuffing an arrestee:

> [Defendant assumes] that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will flee or do them harm. As is sadly borne out in the statistics for police officers killed and assaulted in the line of duty each year, however, this assumption has no basis in fact.
>
> Handcuffs are a temporary restraining device; they limit but do not eliminate a person's ability to perform various acts. They obviously do not impair a person's ability to use his legs and feet, whether to walk, run, or kick. Handcuffs do limit a person's ability to use his hands and arms, but the degree of the effectiveness of handcuffs in this role depends on a variety of factors, including the handcuffed person's size, strength, bone and joint structure, flexibility, and tolerance of pain. Albeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself. Finally, like any mechanical device, handcuffs can and do fail on occasion.

*See United States v. Sanders*, 994 F.2d 200, 208-10 (5th Cir. 1993) (citation omitted); *see also United States v. Helmstetter*, 56 F.3d 21, 23 (5th Cir. 1995). In *Helmstetter*, the court found a *Chimel* search of a handcuffed person valid when the "limited restraint placed on [defendant] impeded but did not prevent him from reaching the readily accessible weapon" under the chair in which he was seated. *Helmstetter*, 56 F.3d at 23. Also, a New York district court upheld a search under a mattress analogous to the one at issue here, concluding that the hidden weapon was within the suspect's "immediate control" even though she had been handcuffed and was lying face down on the floor near the bed. *United States v. Hernandez*, 738 F. Supp. 779, 782-83 (S.D.N.Y. 1990),

17

*aff'd*, 941 F.2d 133 (2d Cir. 1991).  The court found that "if [the suspect] were left unattended even for a short period of time and knew where the gun was, it would not be an impossible task even for one handcuffed from behind to work her hands between the mattress and the box spring and grab the weapon."  *Id.*  Acknowledging that it would not second guess the reasoned judgment of law enforcement at the time, the court held that the police search was constitutionally proper.  *Id.* (*citing United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568 (1985)); *cf. Blount*, 123 F.3d at 838.

The instant case is quite similar to *Hernandez*.  Because the sawed-off shotgun was at the foot of the bed near the edge of the mattress, and the defendant was 4 to 5 feet away from that spot at the time of the arrest, the weapon was in Yanez's "immediate control" despite the handcuffs' limitation.  The weapon was indeed not as readily accessible as the gun in *Helmstetter*, beneath the defendant's chair.  However, the court finds that the shotgun was within the area under the defendant's immediate control or his lunge reach, and thus the search did not violate the defendant's Fourth Amendment protections.

### 3.  The Third Warrantless Entry into the Home

Lastly, the defendant argues that the "officers' third, warrantless entry into the home–after placing both Mr. Yanez and Mr. Sanchez in a patrol car–and their subsequent return to the bedroom (where they actually, physically seized the shotgun) were not justified by exigent circumstances."  *See* Dkt. 31 at 9.  The Government vehemently disagrees with this characterization of events, arguing that the officers entered the home the third time "to recover the firearms that they had already discovered in the room. . . . The officers would have been grossly negligent to leave the firearms

inside the house."[7]  *See* Dkt. 32 at 2.  Indeed, the court agrees that leaving the weapons inside a home where the police had not ensured that all suspects had been removed posed a continuing threat to the public and the officers, presenting an exigency that justified the officers' third entry.  Thus, the Government has demonstrated that the warrantless search and seizure of the shotgun was reasonable and is valid under the Fourth Amendment.

As stated above, the Government has the burden to prove the existence of exigent circumstances.  *See Maldonado*, 472 F.3d at 393; *see also Rico*, 51 F.3d at 501.  In evaluating exigency, the court considers "the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." *United States v. Rodea*, 102 F.3d 1401, 1405 (5th Cir. 1996).  "If reasonable minds could differ, we do 'not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation.'" *See Maldonado*, 472 F.3d at 393 (quoting *Blount*, 123 F.3d at 838).

"The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."  *Hayden*, 387 U.S. at 298-99.  In this case, the officers had entered the home twice already to remove two innocent bystanders and two suspects found within the defendant's bedroom.  At the suppression hearing, Lt.

---

[7] In the Government's Second Response to Defendant's Motion to Suppress, *see* Dkt. 32 at 3, it alternatively defends the third entry and subsequent search on the basis of Crystal Yanez's consent.  The Government reiterates this position in its Third Response to Defendant's Motion to Suppress.  *See* Dkt. 34 at 1.  However, while the development of the record regarding the voluntariness of the consent, which the Government bears the burden to prove, *see Schneckloth v. Bustamante*, 412 U.S. 218, 222, 93 S. Ct. 2041 (1973), is paltry at best, the court need not address the consent issue due to its decision upholding the constitutionality of the last entry and search on the basis of exigent circumstances.

Casko testified that after the suspects were removed, he still had further work to do in the immediate aftermath of the arrest to safeguard the public:

> Q. [Mr. Hileman]: After you took these two suspects out of the house, did you know if there was anyone else in the house?
>
> A. [Lt. Casko]: We didn't know. No.

*See* Dkt. 30 at 53.  Casko and Blankenship had to reenter the home, only minutes after securing the suspects, in order to search for any undisclosed accomplices and seize any weapons that could be used against them.  In short, their actions to enter the home and seize accessible weapons, including the shotgun, were reasonable and necessary, as an undisclosed accomplice could have recovered the weapons and threatened the surrounding community at any moment.  To behave differently would have been, in the Government's words, "grossly negligent." *See* Dkt. 32 at 2; *see also Hopkins v. Alabama*, 524 F.2d 473, 475 (5th Cir. 1975).

In *Hopkins*, the Fifth Circuit found a similar search to be justified by exigent circumstances. In that case, four policemen visited a home in Huntsville, Alabama on January 6, 1971, to investigate a robbery which occurred earlier that same day.  *Id.* at 474.  One of the detectives knocked on the door, an action which was answered by gunshots fired from within the home, obviously threatening the safety of the officers and neighbors.  *Id.*  Several people exited the house in the rear and were arrested and searched.  *Id.*  The officers threw tear gas into the house, and Jerry Wayne Hopkins emerged through the front door.  *Id.*  He too was arrested and searched.  *Id.*  None of these searches produced the weapon which was used to fired on the officers.  *Id.*  The officers then entered the home without a warrant, searched the premises, and discovered a .32 caliber automatic pistol.  *Id.* Hopkins was sentenced to 20 years in prison for assaulting a peace officer with a deadly weapon.

*Id.* In determining that the contested search was based on exigent circumstances, the Fifth Circuit

stated the following:

> While Hopkins was arrested outside the house his presence there was the direct result of tear gas fired into the house to dislodge the shooter or shooters who were firing on the surrounding officers.  The search of the house was made immediately after Hopkins was driven out and arrested.  Since the gun had not been found before the search, the officers could have reasonably feared that the weapon and its user still remained in the house.  *The immediate need to ensure that no one remained in the house* preparing to fire the yet unfound weapon obviously justified this warrantless search.

*See id.* at 475 (emphasis added).

Like the officers' need to enter the home to secure the premises in *Hopkins*, Officers Casko

and Blankenship had no reasonable option but to reenter Yanez's residence and retrieve the weapons

and ensure that every potential participant in Yanez's criminal endeavor had been subdued.  And

while *Hopkins* involved a situation in which the weapon's user necessarily remained in the home

before the search, and Yanez and Sanchez had been removed from the home before the officers' third

entry in this case, Casko and Blankenship "could have reasonably feared" that another accomplice

may still have been inside the premises that had not yet been fully searched in the exigencies of the

moment.[8]  *See id.*; *cf. Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408 (1978) (finding in different

---

[8] The defendant cites two cases involving what he deems were similar searches and which were found unconstitutional as lacking any justifiable exigency.  *See* Dkt. 31 at 6-10 (citing *United States v. Ford*, 56 F.3d 265 (D.C. Cir. 1995); *United States v. Satterfield*, 743 F.2d 827 (11th Cir. 1984)).  Although these cases are not binding in this circuit, the court nonetheless finds that they are readily distinguishable from the case at bar.  In both of the cited cases the court found a lack of exigency based in part on the fact that the police had accounted for all persons within the home.  *See Ford*, 56 F.3d at 271 ("As in *Mincey*, the police in this case had secured all the persons in the apartment of Ford's mother.  There simply were no exigent circumstances in this case making the needs of law enforcement so compelling that the warrantless search was objectively reasonable under the Fourth Amendment."); *Satterfield*, 743 F.2d at 844 (finding that, among other reasons, "the officers had already determined that no one else was present in the

circumstances that no exigency was present when "[a]ll the persons in [defendant's] apartment had been located" before the officers initiated their warrantless search in a homicide investigation).  Of course, we know now that there were no other accomplices in the home, but this court will not condemn the officers' reasonable actions based on the luxury of 20/20 hindsight.  *See United States v. Cataldo*, 47 F.3d 1178, 1995 WL 66443 (10th Cir. 1995) (unpublished table decision) ("The issue is not whether after the entry the officers concluded there was an exigency but whether before the entry the warrantless entry appeared reasonable to those officials who decided to make such entry.").  Thus, just as the home entry and seizure of the pistol were warranted in *Hopkins* to prevent any potential future threats, so too was the entry and seizure of the shotgun in this case an objectively reasonable action under the Fourth Amendment's doctrine of exigent circumstances.  Accordingly, the Government has met its burden to demonstrate the third entry and subsequent seizure of the weapon did not violate the Fourth Amendment.

**4.  Conclusion**

     All three of the officers' entries into the home were made under exigent circumstances, and the scope of the searches matched the exigency.  *See Tamez v. City of San Marcos, Tex.*, 118 F.3d 1085, 1093-94 (5th Cir. 1997).  The officers' first entry was made to rescue innocent bystanders from the danger created by the then undiscovered suspects who were firing a weapon from within the house.  The second entry was made to arrest those who apparently fired the weapon more than 30 times, and to make a cursory precautionary search for any weapons recently fired and within the

---

building.  Under these circumstances, the search for the shotgun was not justified by exigency.").  This case, by contrast, involved a situation in which the police would have been remiss in their duties if they had left the scene of the crime without ensuring that no possible suspects remained in the home and that any accessible weapons had been removed from the premises.  The materially different situations in *Ford* and *Satterfield* thus do not detract from this court's finding of exigent circumstances in this case.

defendant's reach.  Because the suspects were found together in the defendant's bedroom, the officers had probable cause to arrest both suspects and to search the areas within their immediate control.  Thus, the search under the mattress effected contemporaneous with Yanez's arrest was justified on the basis of exigent circumstances and alternatively on the basis of *Chimel* and its progeny.  Finally, the third entry into the home and the accompanying seizure of the shotgun only minutes after leaving the home was necessary under the circumstances to find any hidden accomplices and seize the weapons they could have used to reinitiate further threats against police and public safety.  Accordingly, the officers' actions in this case comported with the Fourth Amendment, and the shotgun is admissible at Yanez's upcoming trial.

### B.  THE FIFTH AMENDMENT

Defendant also seeks the exclusion of the statements made to the police after his arrest. He contends that these statements were the product of unwarned questioning and the admission of such statements would violate *Miranda*'s Fifth Amendment requirements.  *See United States v. Patane*, 542 U.S. 630, 641, 124 S. Ct. 2620, 2629 (2004) (Thomas, J.) (plurality opinion) ("Potential [constitutional] violations occur, if at all, only upon the admission of unwarned statements into evidence at trial.").  The Government argues that defendant's first round of statements are admissible because they were made "spontaneously and not in response to interrogation of him by [the] officers."  Dkt. 18 at 6.  The Government also argues that the second round of statements were volunteered, and, alternatively, were made after *Miranda* warnings were given and defendant waived his rights.  As to the initial statements, the court agrees with the Government that the statements were volunteered and do not violate *Miranda*'s ban on unwarned custodial *interrogation*.  Moreover, as to the second round of statements made in Officer Drey's police car, the Government has not demonstrated that Lt. Casko warned the defendant of his right to appointed counsel.  Pending further

development of the factual record on this issue, the court will defer ruling on the admissibility of these statements until the time of trial.

## 1.  The First Set of Statements

The Supreme Court's seminal *Miranda* decision requires the familiar warnings of a suspect's right to silence and counsel to be given whenever there is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602 (1966).  As recounted in detail above, when the defendant made the challenged statements outside his home, he was already under a lawful arrest.  Thus, he was in "custody" for *Miranda* purposes. *See Courtney*, 463 F.3d at 337.  The occurrence of an interrogation *vel non* is the key issue on whether defendant's first round of statements are admissible.

By its terms, the *Miranda* decision only applies to custodial "*questioning* initiated by law enforcement officers." *Miranda*, 384 U.S. at 444 (emphasis added).  The Court declined to delineate the contours of official questioning and left that task to future courts.  In 1980, the Court took up its earlier invitation, broadly construing the term "questioning" to include traditional, express interrogation methods and their "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682 (1980).  This expansive definition includes interrogative statements and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

This broad formulation, however, is not subject to commensurate, broad application.  For example, after announcing the test, the *Innis* Court found that the facts of that case did not evidence

any police interrogation.  *Id.* at 302.  *Innis* involved two police officers discussing the whereabouts of a missing shotgun believed to be used by the defendant in a recent murder.  *Id.* at 293-94.  The conversation at issue occurred while the defendant was in a police cruiser with the officers as they were headed to the police station.  *Id.*  As the car passed a school for handicapped children, one officer expressed his concern to his partner that "God forbid one of them might find a weapon with shells and they might hurt themselves."  *Id.*  Notably, the entire exchange occurred *after* the defendant had requested a lawyer in response to his *Miranda* warnings.  Nevertheless, despite the arguably inquisitive aspect to the officers' statements, the Court found that their purported "subtle compulsion" did not rise to the level of interrogation.  *Id.* at 303 (*quoting State v. Innis*, 391 A.2d 1158, 1162 (R.I. 1978)).  Over two forceful dissents, the Court held that "given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would [make an self-incriminating response]."  *Id.*; *id.* at 305 (Marshall, J., dissenting) ("I am utterly at a loss . . . to understand how [the Court's] objective standard as applied to the facts before us can rationally lead to the conclusion that there was no interrogation."); *id.* at 309 (Stevens, J., dissenting) ("In my view any statement that would normally be understood by the average listener as calling for a response is the functional equivalent of a direct question, whether or not it is punctuated by a question mark. The Court, however, takes a much narrower view.").  Accordingly, it is difficult for a defendant to prove that official conduct rises to the level of the "functional equivalent" of interrogation.  *Id.* at 300-01.

In this case, the Government asserts, and Lt. Casko testified, that the defendant made his incriminating statements spontaneously and voluntarily to prevent his cohort from being implicated in the crime.  *See* Dkt. 18 at 6 ("All of the statements should be admitted at trial against the

defendant because they were made by the defendant spontaneously and not in response to interrogation of him by [the] officers."); *see also* Dkt. 30 at 20-21.  The court agrees with the Government and  rejects Ramiro Sanchez's testimony to the contrary.  The court finds that Yanez made the first round of incriminating statements outside the pressures of traditional police interrogation or its "functional equivalent."  *Innis*, 446 U.S. at 300-02.  Thus, these statements are unquestionably admissible.  *See id.*; *see also Sockwell v. Blackburn*, 748 F.2d 979, 981 (5th Cir. 1984) ("[T]he *Miranda* decision does not apply to volunteered statements, and certainly not to a spontaneous reply to a question by [a private citizen]." (first alteration in original)).

## 2.  The Second Set of Statements

With regard to the defendant's second round of statements, however, judging their constitutionality is much more problematic.  Although the Government argues that these statements were made spontaneously, *see* Dkt. 18 at 6, the evidentiary record belies this assertion.  Lt. Casko testified that he Mirandized the defendant when he returned outside after the third entry and "spoke to him in the car."  *See* Dkt. 30 at 22.  This statement clearly bears the hallmarks of custodial questioning, even if it was not performed in the traditional station house setting.  For these statements to be admissible under *Miranda*, the Government has the burden to demonstrate that the officers warned the defendant of all of his constitutional rights inherent within the Fifth Amendment and that the defendant made a knowing, intelligent, and voluntary waiver thereof.  *See Miranda*, 384 U.S. at 444 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."); *United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994) ("It is axiomatic that an accused must be informed of his *Miranda* rights in a way that ensures his knowing, intelligent, and voluntary exercise or waiver thereof.").

And while the Government need not show that it recited the warnings precisely as they are found in the text of the *Miranda* decision itself, *see California v. Prysock*, 453 U.S. 355, 361, 101 S. Ct. 2806 (1981), the Supreme Court has emphasized that officer must still "reasonably conve[y] to [a suspect] his rights as required by *Miranda*." *See Duckworth v. Eagan*, 492 U.S. 195, 203, 109 S. Ct. 2875 (1989) (internal quotation marks omitted).  In other words, the officers must adequately convey the general substance, if not the precise wording, of each and every right guaranteed by the *Miranda* decision for any subsequent waiver to be valid.  *Prysock*, 453 U.S. at 361.  Those rights include the following: (1) that the suspect has a right to remain silent; (2) that anything he says can be used as evidence against him; (3) that he has a right to an attorney; *and* (4) that he has a right to an attorney even if he cannot afford one.  *See Miranda*, 384 U.S. at 444.  The failure to notify a person undergoing custodial interrogation that he has the right to appointed counsel at questioning generally renders the statements inadmissible in the Government's case in chief at trial.  *See Michigan v. Tucker*, 417 U.S. 433, 449-52, 94 S. Ct. 2357 (1974).

Here, Lt. Casko testified that he Mirandized defendant and gave him the first three of the warnings enumerated above and that the defendant waived these *Miranda* rights.  Dkt. 30 at 22-23.  However, the Government did not demonstrate that Casko administered the fourth warning, that is, that Yanez had a right to appointed counsel's presence during any custodial interrogation.  The defendant argues that this failure means that the statements are categorically inadmissible at trial.  *See* Dkt. 31 at 14.  In response, the Government contends that Lt. Casko read the *Miranda* warnings to the defendant from a card, and that any omission in Casko's testimony was inadvertent and can be corrected through further testimony.  *See* Dkt. 34 at 2.  However, Lt. Casko did not testify at the suppression hearing that he read the defendant his rights from a card.  The court agrees that further

testimony is necessary to decide the issue of the admissibility of the defendant's statements made to Lt. Casko in Officer Drey's car.  Thus, the court defers a decision on the *Miranda* issue related to these statements until further testimony from Lt. Casko is obtained at trial outside the presence of the jury.

### 3.  Conclusion

The record demonstrates that the defendant's first confession was made voluntarily and spontaneously, avoiding any concerns of coercive conduct that mandated *Miranda*'s prophylactic rule.  Nevertheless, the record in its current state is insufficient to allow the court to make an informed decision on the admissibility of the defendant's second confession.  Accordingly, the defendant's first round of statements is admissible at trial, and the court reserves a ruling on the admissibility of the second of round of statements pending further testimony from Lt. Casko at trial outside the jury's presence.

### C.  THE FRUIT OF THE POISONOUS TREE DOCTRINE

Finally, the defendant seeks the exclusion of his testimonial statements as illegal fruit derived from the previous, causally-connected search.  *See Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407 (1963).  This exclusion would be warranted under what is commonly referred to as "the fruit of the poisonous tree" or "derivative evidence" doctrine.  The *Wong Sun* Court explained:

> We need not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Id.* (internal quotation marks omitted).

28

In this case, the subsequent statements about the weapon and defendant's ownership were unquestionably the product of the weapon's discovery in the immediate past.  However, the court has already found that the search and seizure of the shotgun did not violate the Fourth Amendment. Accordingly, there is no "primary taint" which infects the subsequent statements to the police, and the derivative evidence doctrine is inapplicable to this case.

### IV. CONCLUSION

After police arrested the defendant in his home for recklessly firing a weapon in a metropolitan area, they obtained physical and testimonial evidence tending to prove defendant's guilt.  Defendant has moved to exclude this evidence from his upcoming trial on three grounds: (1) The Fourth Amendment's prohibition of unreasonable searches and seizures; (2) The Fifth Amendment's *Miranda* doctrine requiring the exclusion of unwarned statements given during custodial interrogation; and  (3) The Supreme Court's derivative evidence doctrine requiring the exclusion of evidence tainted by a previous illegality.  The Court finds that, as to the Fourth Amendment challenges, the shotgun obtained in the room is admissible because of the exigent circumstances involved.  The police reasonably searched for all items which had been used, and might be used again, to threaten public safety.  Thus, the sawed-off shotgun, seized during a lawful search, is not subject to exclusion.

As to the Fifth Amendment challenges, the defendant's initial statements were volunteered outside any police interrogation, as that term is defined by the Supreme Court for *Miranda* purposes. Consequently, these statements are admissible at trial.  As to the second confession, the Government has not demonstrated that it was made after a voluntary waiver of every *Miranda* right, but the court agrees with the Government that this failure may have been an oversight at the suppression hearing.

Accordingly, the court will defer a ruling on the admissibility of the defendant's second round of statements' until further testimony is elicited at trial outside the presence of the jury.

Lastly, because the court concludes that the shotgun was discovered lawfully, there is no reason to apply the judicially-created fruit of the poisonous tree doctrine.

For the foregoing reasons, the defendant's motion to suppress is DENIED in its entirety, except that the court reserves ruling on the issue of the admissibility of the second round of statements pending further factual development.

It is so ORDERED.

Signed at Houston, Texas on May 31, 2007.

_____
Gray H. Miller
United States District Judge

30